## GILLESPIE et al. *v.* CAMMACK et al.

The drawer of a bill is not entitled to notice of non-payment by the acceptors, where the acceptance was for his accommodation, and he had undertaken to send funds to them with which to pay it, and failed to do so.

To constitute legal fraud, in case of a preference given by an insolvent to one creditor over another, so as to affect the preferred creditor, it must appear that the creditor, as well as the debtor, was not in good faith, that he knew of the insolvency of the debtor, and contemplated the securing to himself of an advantage over the other creditors.

The action to annul a contract on the mere grounds of the preference given to one creditor of an insolvent over another, is prescribed by one year. C. C. 1982.

Where certain mortgage creditors of an insolvent sue to annul a judgment rendered on the confession of the debtor, and recorded anterior to the date of their mortgage, on the allegation that the confession was a contract in fraud of the other creditors, the action must be brought within the time prescribed by art. 1982 of the Civil Code. The rule *Quæ temporalia,* &c. is inapplicable to this case, it is limited to cases where the defendants who set it up as an exception are in possession of the thing, or in the enjoyment of the liberty which the contract offered to them is intended to restrain. Here the judgment creditor was in possession of a mortgage right dating from the time of its registry.

Where a register of mortgages is shown to have kept but one book for the inscription of conventional and judicial mortgages, the fact that a judicial mortgage was not recorded in a separate volume of judicial mortgages will not be allowed to prejudice the judgment creditor. *Per Curiam:* As there was but one book kept, third persons could not be misled.

Where, at the date of a bill, a statute was in force allowing damages at ten per cent in case of protest, the right to damages at that rate must be considered as part of the contract. A subsequent statute reducing the rate, though in force at the time of suit, cannot affect the right of the creditor to damages at the rate fixed by the statute in force at the date of the contract.

One who purchases property, or acquires a mortgage on it, pending a litigation in relation to it, though for a valuable consideration, and without any express or implied notice in point of fact, will be bound by any decision that may be made against the person from whom he acquired his title or mortgage.

APPEAL from the District Court of Concordia, *Farrar*, J. *Stacy* and *Sparrow*, for the appellants. *Lockett* and *Micou*, for the defendants. The judgment of the court was pronounced by

SLIDELL, J.   This case presents a controversy between the plaintiffs and defendants, with regard to the distribution of the proceeds of a judicial sale of certain lands and slaves. *Cammack & Co.* (who act in this case for the use of *Stetson & Avery*, their transferrees,) obtained a judgment, in April, 1839, in Concordia, against *Watson*, which was recorded in June, 1840. In May, 1841, they instituted an action against *Watson* and *Walker*, alleging that a sale of the lands and slaves, of which the fund in controversy is the representative, made in December, 1837, by *Watson* to *Walker*, was fraudulent and simulated. In this suit *Cammack & Co.* were successful. They obtained a verdict and judgment in 1845, which was sustained upon appeal by this court. By this judgment the sale was decreed null, and the property declared to be subject to be seized and sold in satisfaction of *Cammack & Co's.* judgment. See *Cammack v. Watson*, 1 Annual R. 134. In 1842, *Walker* granted a mortgage upon the land and slaves in favor of *Roberts*, the agent of certain trustees of the Bank of the United States, to secure certain notes then executed by *Walker*, but of which the consideration was an antecedent liability. The Planters Bank of Mississippi obtained judgments against *Watson* in Concordia, which were recorded in September, 1840, and February, 1841. The dates of registry and of rendition of these judgments were posterior to the rendition and registry of the judgment in favor of *Cammack & Co.* The Planters Bank also brought a similar suit to annul the sale by *Watson* to *Walker*, commencing their action in April, 1841. They also alleged the simulation of that sale. There was a verdict for the defendants, in December, 1841. Upon appeal to the Supreme Court the judgment was reversed and the sale avoided; a re-hearing however was granted, and, while it was pending, the parties made a compromise, and by agreement the suit was dismissed. By this compromise, which was made in 1843, *Watson* and *Walker* gave to the assignees of the Planters Bank, in satisfaction of their claims, their new notes, secured by a mortgage upon the above mentioned lands and slaves. These notes were subsequently transferred by the assignees to *Gillespie*.

Before considering the relative rank of these litigants, it is proper to dispose of certain special grounds of defence which are set up by *Roberts* and *Gillespie* against the alleged judicial mortgage rights of *Stetson & Avery*, the assignees of *Cammack & Co.* The judgment obtained by *Cammack & Co.* was founded upon a bill of exchange, drawn in Mississippi, by *Watson* upon *Bogart & Hoopes*, merchants at New Orleans, and by them accepted. The bill was dated in February, 1836, and was payable in February, 1837. It is said that this judgment was confessed, that *Watson* was insolvent at the date of the confession, and that he had a valid defence to the suit, which he did not urge.

Under the evidence, we are not prepared to say that the notice of protest was well given. But it is conclusively shown that the acceptance was given purely for the accommodation of the drawer; that he promised to send funds to the acceptors to meet the payment of the bill, but failed ever to do so. Under such circumstances, it is clear that the drawer was not entitled to notice.

GILLESPIE
v.
CAMMACK.

To withdraw the bill from the category of accommodation paper, the plaintiffs rely upon the fact that a mortgage was executed in 1845 to secure *Bogart & Hoopes*. In this instrument the mortgagor recites that *Bogart & Hoopes* had accepted certain bills for him, and had agreed to accept others ; that all the acceptances made, or to be made, for him, were gratuitously given, and to be given, from disinterested motives, and for the sole purpose of assisting him in his pecuniary negotiations; that he was desirous to secure them from all loss proceeding from the hazard of trade or otherwise, and therefore, to secure them against the payment of such drafts, he mortgaged, &c. The execution of this mortgage cannot be considered as destroying the effect of the agreement, clearly proven, to provide funds to meet the bill at its maturity, especially when taken in connection with the strong and unequivocal declaration in the act of mortgage that the acceptances were purely accommodation. The evident intention of the parties was that, the bills should be covered by funds to be provided by the drawer ; the mortgage was for the further indemnity of the acceptor, and certainly did not authorize the drawer to entertain a *reasonable* expectation that the bills would be paid, if his promise of remittance was violated. It is not however indispensable to the excuse of the holder to rest the case upon this view of the intentions and expectations of the parties, for in fact the mortgagees, in order to enable the mortgagor to raise money by mortgaging the property to other parties, released the mortgage before the bill matured ; and we find also, not only the confession of judgment, but subsequent promises by *Watson* to pay the debt. It cannot be reasonably objected that *Watson* was not aware of the irregularity as to notice, if irregularity there had been. For the notarial certificate of notice was on file in the cause when he confessed judgment, withdrawing the general denial which he had first pleaded.

But it is said that, at the time when the judgment was confessed, *Watson* was insolvent, and that such confession was a contract in fraud of the other creditors of *Watson*. That *Watson* was the actual debtor of *Cammack & Co.* is clear ; and if there was a fraud it was merely such a legal fraud as results from a preference given by an insolvent to one creditor over another. To constitute such legal fraud, so as to affect the preferred creditor, it must appear that he also was not in good faith; that he knew the insolvency of the debtor, and contemplated the securing to himself an advantage over the other creditors. We do not think the evidence sufficient to impeach the good faith of the creditor in the present case. It is not satisfactorily shown that there was any fraudulent knowledge or intent, on the part of the plaintiffs in that suit. They brought their action in 1837, the cause remained at issue till 1839, and then the confession, after the debtor had probably exhausted the usual means of delay, was given in consideration of an onerous condition, a stay of execution for six months. The face of the proceedings certainly does not present that precipitancy which usually marks a fraudulent confession.

Independent, however, of these considerations, we are of opinion that it is too late for the plaintiffs in this cause to raise the question of illegal preference. The revocatory action in such cases is bound by one year. Civil Code, 1982. *Atchafalaya Bank* v. *Caldwell*, 14 La. 308. But to this the plaintiffs answer that, their interest did not arise until there was a conflict between *Watson's* creditors, as to whose debts should be paid and whose lost; that the judgment of *Cammack & Co.*, so long as it was not executed, did not affect the other creditors ; that when it is sought to be executed, then the plaintiffs may interpose their exception to the judgment, and show its nullity. They invoke the princi-

ple *Quæ temporalia sunt ad agendum, perpetua sunt ad excipiendum.* This reasoning is specious, but not solid; the maxim is misapplied. *Cammack & Co.* having recorded their judgment, its registry was notice to all other creditors. They occupy the attitude of possessors of a mortgage right, dating from the 16th June, 1840. The plaintiffs claiming under a subsequent registry are the attacking party. They seek to degrade the prior mortgagee; to oust him from the possession of his prior rank, which he has peaceably held for much more than one year. They have not possessed the superior rank, but a secondary one. But it is the possessor, for whose benefit the rule, *Quæ temporalia,* may be invoked. "Tout le monde est d'accord aujourd'hui que la règle dont il s'agit doit être limité au cas où le defendeur qui propose l'exception possède la chose, ou jouit de la liberté que le contrat qu'on lui oppose a pour but de limiter en lui." "La règle *quæ temporalia* n'est que l'expression de cette vérité constante et palpable qu'on ne prescrit pas contre celui qui possède, et que si l'on jouit d'un état ou d'une position quelconque, on n'a besoin que d'une exception pour s'y faire maintenir, et nullement d'une action. 2 Troplong, Prescription, § 827 *et seq.*

The cases cited by the plaintiffs, illustrate the principle as laid down by Troplong, and the only answer that the defendants need make is that, properly considered, they are authorities in their own favor. Thus in *Thompson* v. *Milburn,* 1 Mart. 469, the purchaser, sued for the price of a slave, was allowed to set up the unsoundness of the slave, although the action of redhibition was barred by the lapse of one year. The defence was properly permitted, because the purchaser was in possession of the price. The case of *Bushnell* v. *Brown's heirs,* was also the case of a purchaser sued for the price. He alleged the deficiencies of the land, and, in the language of Judge Martin, was permitted to use as a shield what he could no longer use as a weapon. See also *Paxton* v. *Cobb,* 2 La. 139.

But the plaintiffs contend that, even if the judgment was valid, it was never so recorded as to have effect against them. It appears by the testimony of the parish judge that, the judgment in favor of *Cammack & Co.,* was recorded in a book in which conventional and judicial mortgages were recorded indiscriminately. As no separate book for judicial mortgages was kept by the recorder, the irregularity should not prejudice the judgment creditor. As there was but one book kept, third persons could not be misled. If they searched in the only book of mortgages kept, they would find the inscription there. The point has been substantially decided in recent cases. .

It is said that the holders of the bill had no right to damages at ten per cent. Copies of portions of two statutes of Mississippi are in evidence. One of these was enacted in 1822, and allows damages upon such a bill at the rate of ten per cent. The other was enacted in February, 1836, and reduced the rate to five. The bill of exchange was drawn on the 15th February, 1836. On what day of February, 1836, the statute was enacted, or went into effect, does not appear. We are not permitted to presume that it was enacted or went into effect before the bill was drawn, and must consider the bill as drawn under the statute of 1822. The right therefore to ten per cent damages, if the bill should be returned protested, being conferred by the statute, must be considered as part of and embodied in the contract, and the subsequent statute must not be construed to operate retrospectively so as to take away a vested right. See *White* v. *McQuillan,* 12 La. 534.

Having disposed of the objections which are urged against the validity of *Cammack & Co's* judgment, it only remains to enquire what are the relative rights of the plaintiffs, who hold mortgages obtained subsequent to the registry of that judgment.

The assignees of the Planters' Bank, under whom *Gillespie* holds, were fully apprised of the simulation of the conveyance by *Watson* to *Walker*. It was expressly charged in the suit to annul it, brought by the bank in 1841. They took the mortgage, which *Gillespie* now holds, from *Watson & Walker*, in 1843. So far as they hold under *Watson*, it is clear that they took subject to the prior encumbrance registered in favor of *Cammack & Co.* in 1840. So far as they held under *Walker*, they took the mortgage with full actual notice that he was a fraudulent and simulated vendee, whose title was a mere shadow fraudulently cast upon the estate, and having no legal existence or efficacy. As *Walker* to their knowledge had no lawful right, he could convey none to them, to the detriment of *Watson's* creditors.

Whether *Roberts* had actual notice when he took his mortgage from *Walker*, in 1842, does not appear. But he had constructive notice, and must give precedence to the defendants. The mortgage was given to him, pending the action instituted by *Cammack & Co.* to have the simulation of the sale adjudged, and the property subjected to their judicial mortgage as the property of *Watson*, the pretended vendor.

It is a rule of universal jurisprudence, and one which has been expressly recognized in our Civil Code, that every man is presumed to be attentive to what passes in the courts of justice of the State where he resides, or has transactions. A purchase therefore of an estate actually in litigation, *pendente lite*, even for a valuable consideration, and without any express or implied notice in point of fact, affects the purchaser in the same manner as if he had such notice, and he will accordingly be bound by the decree in the suit. The rule may sometimes operate harshly, but is founded upon grave considerations of public policy, and must therefore be respected and enforced. See Story's Equity, vol 1, 394. Civil Code, 2428. *Long* v. *French*, 13 La. 257. *Cable* v. *Davenport*, 4 La. 557. See also the elaborate opinion of Chancellor Kent, in *Murray* v. *Ballow*, 1 John. Ch. 576, in which he gives at length the english authorities, and, while recognizing the occasional hardship of the doctrine, says it is one of those cases in which private mischief must yield to general convenience.

The principle which defeats conveyances made *pendente lite*, applies *a fortiori* to encumbrances.

In the case of the *Bishop of Winchester* v. *Payne*, 11 Vesey, jr. 194, the question was whether subsequent mortgagees of an equity of redemption were bound by a decree of foreclosure though not made parties, their rights having been acquired *pendente lite*. Sir William Grant said: "Ordinarily, it is true, the decree of the court binds only the parties to the suit. But he who purchases during the pendency of the suit, is bound by the decree that may be made against the person from whom he derives title; the litigating parties are exempted from the necessity of taking any notice of a title so acquired. As to them, it is as if no such title existed. Otherwise suits would be indeterminable, or, which would be the same in effect, it would be in the pleasure of one party at what period the suit should be determined. The rule may sometimes operate with hardship upon those who purchase without actual notice, yet general convenience requires its adoption; and a *mortgage* taken *pendente lite* cannot be exempted from its operation. *Judgment affirmed.*